[No. 41365.     En Banc.     May 6, 1971.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM RABE, *Appellant*.

*Critchlow, Williams, Ryals & Schuster*, by *Rembert Ryals*, for appellant.

*Herbert H. Davis, Prosecuting Attorney,* and *Curtis Ludwig, Deputy,* for respondent.

McGovern, J.—This is an appeal from a judgment entered upon the defendant's conviction of the crime of exhibiting an obscene motion picture film in violation of RCW 9.68.010.

Defendant managed an outdoor drive-in theater in the city of Richland. At the time of his arrest, he was exhibiting the motion picture "Carmen Baby" and had imposed no age restriction upon the paying audience. The picture screen of the outdoor theater was situated in such a way that it faced 12 to 15 adjoining family residences and a portion of a nearby major highway. Pictures upon the screen were thus visible to residents of those homes and their guests, to passing motorists upon the highway, and to those persons who would look at the screen from just outside the chain-link retaining fence enclosing the theater grounds.

August 28, 1968, a Richland police officer stood outside the theater fence and observed a portion of the film being shown. The following night, from the same vantage point, that officer and the Richland city attorney viewed almost the entire film. On both occasions, teenage and younger children were observed by the officer to be watching the motion picture from various points outside the theater fence.

Thereafter, the complaining officer appeared before a Richland justice of the peace and testified that he had observed the motion picture. He described some of the more objectionable scenes of the movie and informed the magistrate that teenage and pre-teenage children were viewing the picture from the periphery of the theater enclosure. Upon formal written complaint, a warrant for the arrest of the defendant was then issued and executed. As an incident to the arrest, and for evidentiary purposes, two reels of film of "Carmen Baby" were seized by the arresting officers.

October 3, 1968, defendant was convicted in the Richland District Justice Court of "wrongfully and unlawfully caus[ing] to be exhibited an obscene, indecent and immoral show" contrary to RCW 9.68.010.[1] He thereupon appealed to the Benton County Superior Court where following a trial de novo, he was again found guilty of the charge. The superior court did not conclude that the picture was obscene in its entirety, but rather that "Individual portions or scenes of the movie . . . are obscene and to passing motorists or persons and residents outside the theatre those individual scenes become a movie by themselves." It therefore concluded that the defendant was guilty of exhibiting an obscene movie and entered judgment accordingly.

On this appeal, defendant first argues that the seizure of the motion picture film for evidentiary purposes without a prior *adversary* hearing on the question of its obscenity constituted a prior restraint on his First Amendment right to freedom of speech. He contends that the rule announced in *Metzger v. Pearcy*, 393 F.2d 202 (7th Cir. 1968), is applicable here and that it requires a reversal of his conviction for the reason that the improperly seized film should not have been admitted in evidence against him. In *Metzger*, the court said, at page 204:

> The lesson of *Books* [378 U.S. 205, 12 L. Ed. 2d 809, 84 S. Ct. 1723 (1964)] is that law enforcement officers cannot seize allegedly obscene publications without a prior adversary proceeding on the issue of obscenity. Such a seizure violates the First Amendment to the Constitu-

---

[1]RCW 9.68.010 then provided: "Every person who—

"(1) Having knowledge of the contents thereof shall exhibit, sell, distribute, display for sale or distribution, or having knowledge of the contents thereof shall have in his possession with the intent to sell or distribute any book, magazine, pamphlet, comic book, newspaper, writing, photograph, motion picture film, phonograph record, tape or wire recording, picture, drawing, figure, image, or any object or thing which is obscene; or

"(2) Having knowledge of the contents thereof shall cause to be performed or exhibited, or shall engage in the performance or exhibition of any show, act, play, dance or motion picture which is obscene;

"Shall be guilty of a gross misdemeanor."

tion of the United States, and is a prior restraint condemned by the Supreme Court. In light of *Burstyn,* supra [343 U.S. 495, 96 L. Ed. 1098, 72 S. Ct. 777 (1952)], *Kingsley Pictures,* supra [360 U.S. 684, 3 L. Ed. 2d 1512, 79 S. Ct. 1362 (1959)] and *Jacobellis,* supra [378 U.S. 184, 12 L. Ed. 2d 793, 84 S. Ct. 1676 (1964)] these rules apply to motion pictures as well. Allegedly obscene publications or movies are not to be treated the same way as narcotics, gambling paraphernalia and other contraband.

■ Although numerous federal district and circuit courts have recently adopted the viewpoint that a prior adversary hearing must be afforded before an allegedly obscene motion picture may be constitutionally impounded (*Metzger v. Pearcy, supra; Astro Cinema Corp. v. Mackell,* 422 F.2d 293 (2d Cir. 1970); *Demich, Inc. v. Ferdon,* 426 F.2d 643 (9th Cir. 1970); *Cambist Films, Inc. v. Duggan,* 420 F.2d 687 (3d Cir. 1969); *Tyrone, Inc. v. Wilkinson,* 410 F.2d 639 (4th Cir. 1969); *Bethview Amusement Corp. v. Cahn,* 416 F.2d 410 (2d Cir. 1969); *Bongiovanni v. Hogan,* 309 F. Supp. 1364 (S.D. N.Y. 1970); *Carroll v. Orlando,* 311 F. Supp. 967 (M.D. Fla. 1970); *Natali v. Municipal Court,* 309 F. Supp. 192 (N.D. Cal. 1969) and cases cited therein), we, unlike those courts, are not persuaded that our nation's highest court requires an *adversary* hearing in every case before a film may be seized as evidence of an obscenity law violation.

The three decisions of the United States Supreme Court which consider in particular the question of whether a prior adversary hearing is constitutionally required are *Marcus v. Search Warrant of Property,* 367 U.S. 717, 6 L. Ed. 2d 1127, 81 S. Ct. 1708 (1961), *A Quantity of Copies of Books v. Kansas,* 378 U.S. 205, 12 L. Ed. 2d 809, 84 S. Ct. 1723 (1964) and *Lee Art Theatre, Inc. v. Virginia,* 392 U.S. 636, 20 L. Ed. 2d 1313, 88 S. Ct. 2103 (1968).

In *Marcus,* the court found improper the seizure of approximately 11,000 copies of 280 different publications considered by the police to be obscene items. The officers were acting under a general warrant authorizing the confiscation of all "obscene" materials upon the defendant's premises.

Mr. Justice Brennan merely noted the absence of a prior adversary hearing on the question of the obscenity of the items to be seized. Speaking for the majority, he considered in detail, however, the error of the magistrate who granted the police a search warrant without the aid of procedures "designed to focus searchingly on the question of obscenity." No publication had been submitted to the magistrate before he issued the warrant. The warrant constituted an unlimited authority to seize any publications which the officers in their discretion considered to be obscene. Although the court suppressed the seized material, it nevertheless distinguished that extensive and indiscriminate suppression of challenged publications from the temporary restraints upon selected publications which it had approved of in *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 1 L. Ed. 2d 1469, 77 S. Ct. 1325 (1957).

Then, in *A Quantity of Copies of Books,* the police made another mass seizure, confiscating 1,715 copies of 31 novels found on the defendant's premises. An adversary hearing had not been held prior to the issuance of the warrant which authorized the seizure, but the judge who issued the warrant made a 45-minute ex parte examination of the materials to be seized, and the titles of the novels involved had been listed in the information filed by the prosecuting attorney. That procedure was held to violate the constitutional restrictions against abridgment of freedom of speech and press "since the warrant here authorized the sheriff to seize all copies of the specified titles, and since [the defendant] was not afforded a hearing on the question of the obscenity . . . before the warrant issued".

We disagree with the 7th Circuit *Metzger* decision and its progeny that *Marcus* and *A Quantity of Copies of Books* and *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 96 L. Ed. 1098, 72 S. Ct. 777 (1952), *Kingsley Int'l Pictures Corp. v. Regents,* 360 U.S. 684, 3 L. Ed. 2d 1512, 79 S. Ct. 1362 (1959), *Jacobellis v. Ohio,* 378 U.S. 184, 12 L. Ed. 2d 793, 84 S. Ct. 1676 (1964), necessarily require a prior *adversary* hearing on the issue of obscenity before a *motion picture film* can

be confiscated as evidence. In fact, *Burstyn, Kingsley Pictures,* and *Jacobellis* did not consider the specific question of a prior adversary hearing. In both *Marcus* and *A Quantity of Copies of Books* the statute being enforced called for civil proceedings directly against the materials and for their eventual destruction. In both instances, the police impounded all of the allegedly obscene publications they found on the premises. Most crucially, the great amount and variety of materials seized without sufficient judicial guidance created a substantial risk that nonobscene publications would also be suppressed. Certainly the scope and consequences of those seizures warranted the imposition of additional procedural safeguards. But the necessity for a prior adversary hearing is substantially less when, as here, the seizure is limited to a single item, the detention is temporary, and the action is initiated only after a cautious judicial scrutiny of the sensitive issues involved.

The single pronouncement of the United States Supreme Court concerning the seizure of a motion picture film as evidence for an obscenity prosecution supports our interpretation of *Marcus* and *A Quantity of Copies of Books.* In *Lee Art Theatre,* the Supreme Court, on the authority of *Marcus v. Search Warrant of Property,* 367 U.S. 717, 6 L. Ed. 2d 1127, 81 S. Ct. 1708 (1961), reversed the conviction of the operator of a motion picture theater for possessing and exhibiting obscene and lewd films. The per curiam opinion noted, however, that the warrant had been issued solely on the basis of conclusory statements in the affidavit of a police officer and that the issuing magistrate had not inquired into the factual grounds for the officer's assertions. Because that process obviously failed to satisfy *Marcus'* demand for a procedure "designed to focus searchingly on the question of obscenity" the confiscation of the film was improper, and its introduction into evidence against the defendant necessitated a reversal of his conviction.

Significantly, the court did not suggest that the prior adversary hearing rule postulated in *A Quantity of Copies of Books* was applicable to the seizure of a motion picture

film, even though it was obvious that the warrant was issued only after an ex parte proceeding. As noted in *Merritt v. Lewis,* 309 F. Supp. 1249, 1251 (E.D. Cal. 1970), "Whatever precedential value *A Quantity of Copies of Books* may have, its pre-seizure adversary hearing requirement is not yet applicable to motion picture cases." *Accord, Entertainment Ventures, Inc. v. Brewer,* 306 F. Supp. 802, 810 (M.D. Ala. 1969).

We agree with *Merritt* that the United States Supreme Court does not require a pre-seizure adversary hearing before an allegedly obscene motion picture can be confiscated for evidence. *Marcus* and *A Quantity of Copies of Books,* 378 U.S. 205, 12 L.Ed. 2d 809, 84 S. Ct. 1723 (1964) suggest that such a hearing is constitutionally required only when a massive seizure of materials, apparently intended to suppress further dissemination of the contents, is effected through procedures insensitive to First and Fourteenth Amendment guarantees. As reemphasized in *Lee Art Theatre,* the primary test is whether the judicial inquiry leading to the seizure "focused searchingly on the question of obscenity" and was sensitive to the accused's freedom of expression.

Our examination of the record before us indicates that a clear and searching inquiry into the nature of the claimed obscenity of the movie was made by Justice of the Peace Albert J. Yencopal of Richland before he authorized the seizure of the film. The officer who testified before the court explained in detail some of the more distasteful and lewd scenes of the movie which were displayed upon the theater screen, and he discussed in general the balance of the movie. We decline to set out here the narrative descriptions testified to by that Richland police officer. We are satisfied that the procedure followed in the justice court substantially complied with the pre-seizure mandates outlined in *Marcus, A Quantity of Copies of Books* and *Lee Art Theatre, Inc. v. Virginia,* 392 U.S. 636, 20 L. Ed. 2d 1313, 88 S. Ct. 2103 (1968). *See also, Bazzell v. Gibbens,* 306 F. Supp. 1057 (E.D. La. 1969), and *United States v. Wild,* 422

F.2d 34 (2d Cir. 1969). We conclude that the seized film "Carmen Baby" was properly admissible in evidence.

Defendant next argues that the trial court's conclusion of law that "Individual portions or scenes of the movie 'Carmen Baby' are obscene and to passing motorists or persons and residents outside the theatre those individual scenes become a movie by themselves" is not legally sufficient under existing United States Supreme Court decisions to support the judgment of obscenity.

■ Considering the facts before us within the framework of the legal principles enunciated in *Redrup v. New York,* 386 U.S. 767, 18 L. Ed. 2d 515, 87 S. Ct. 1414 (1967), and *Close v. Lederle,* 424 F.2d 988 (1st Cir. 1970), we conclude otherwise. Those cases indicate that movies which are obscene only in part may be constitutionally suppressed under state obscenity laws when the movie is commercially exhibited in such a way that it intrudes upon the privacy of nonconsenting citizens who cannot as a practical matter avoid being exposed to the film.

The defendant here does not contend that "Carmen Baby" is totally devoid of obscene material and the record indicates that it is not. Defendant stresses instead that *Roth v. United States,* 354 U.S. 476, 1 L. Ed. 2d 1498, 77 S. Ct. 1304 (1957), stands for the proposition that items are not obscene unless "the dominant theme of the material taken as a whole appeals to prurient interest." Defendant argues, therefore, that the reliance by the trial court on isolated excerpts in determining the worth of the film's contents was erroneous. However, the analysis of the trial court did not have to be guided solely by the *Roth* definition. Although the court's findings and conclusions might have been better enunciated, we find that they sufficiently articulated a sound legal basis for the judgment.

We necessarily viewed the film and found it personally distasteful, offensive and devoid of social, philosophical or artistic merit. However, this court cannot enforce its personal tastes in the guise of law. We are charged with the duty of upholding our state and federal constitutions and of

ensuring to each citizen the fullest exercise of the guarantees contained in those documents. When, as here, freedom of speech and press are challenged by efforts of the police to enforce our state obscenity laws, our resolution of the challenge must necessarily be guided by the United States Supreme Court's troubled and often confusing explication of what expression constitutes obscenity and what expression is entitled to the protective liberties of the federal constitution's First Amendment.

Unfortunately, that court's attempt in *Roth* to define obscenity *vel non* has continued to disappoint and confuse the courts, commentators and community alike. Subsequent opinions in explanation or modification of the initial *Roth* formula have revealed only a growing disharmony among the views of the justices. We would concur with Justice Harlan's lament in *Interstate Circuit, Inc. v. Dallas*, 390 U.S. 676, 707, 20 L. Ed. 2d 225, 88 S. Ct. 1298 (1968), that "The upshot of all this divergence in viewpoint is that anyone who undertakes to examine the Court's decisions since *Roth* which have held particular material obscene or not obscene would find himself in utter bewilderment." The *Roth* definitional approach to obscenity is best summarized by Justice Brennan in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General*, 383 U.S. 413, 418, 16 L. Ed. 2d 1, 86 S. Ct. 975 (1966).

We defined obscenity in *Roth* in the following terms: "[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 U. S., at 489. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.

We have considered the film "Carmen Baby" with strict attention to those legal touchstones and assert that the

dominant theme of the motion picture appeals to the prurient interest. The quantity and variety of sexual acts implied or expressly shown on the screen is out of proportion to its necessity or its part in the film's "theme". But *Jacobellis v. Ohio,* 378 U.S. 184, 12 L. Ed. 2d 793, 84 S. Ct. 1676 (1964) and *Memoirs* emphasized that a work must also be *utterly* without redeeming social value in order to be proscribed by the state. Here, testimony at the trial elicited from several members of the Richland community was rather evenly divided on the question of whether the movie was offensive to the standards relating to sexual matters in that area and whether the movie advocated ideas or was of artistic or literary value. Thus, if we were to apply the strict rules of *Roth,* the film "Carmen Baby" probably would pass the definitional obscenity test if the viewing audience consisted only of consenting adults.

However, we find that "Carmen Baby" is obscene when we consider, as the trial court did, the *context* of its exhibition. Our support for this holding is found in *Redrup v. New York,* 386 U.S. 767, 18 L. Ed. 2d 515, 87 S. Ct. 1414 (1967), and in three 1966 United States Supreme Court decisions that inaugurated a "contextual" approach to materials not strictly definable as obscene.

In *Memoirs,* the Supreme Court reversed a judgment that the book "Fanny Hill" was obscene, primarily because the state court had minimized the social value element now incorporated into *Roth v. United States,* 354 U.S. 476, 1 L. Ed. 2d 1498, 77 S. Ct. 1304 (1957). But Justice Brennan's opinion, characteristically joined only by Justices Warren and Fortas, also noted, at page 420:

It does not necessarily follow from this reversal that a determination that *Memoirs* is obscene in the constitutional sense would be improper under all circumstances . . . the circumstances of production, sale, and publicity are relevant in determining whether or not the publication or distribution of the book is constitutionally protected.

This concern with the circumstances surrounding the dissemination was picked up in the companion case of *Ginz-*

*burg v. United States,* 383 U.S. 463, 16 L. Ed. 2d 31, 86 S. Ct. 942 (1966). There the "pandering" principle was engrafted upon *Roth,* and the defendant's conviction for mailing obscene materials was affirmed. In adopting what has been termed a "contextual" or "variable" approach, the court drew on the concurring opinion of Chief Justice Warren in *Roth,* when it said:

> We perceive no threat to First Amendment guarantees in thus holding that *in close cases evidence of pandering may be probative* with respect to the nature of the material in question *and thus satisfy the Roth test . . .* the fact that each of these publications was created or exploited entirely on the basis of its appeal to prurient interests strengthens the conclusion that the transactions here were . . . not sales of constitutionally protected matter.

(Footnotes omitted. Italics ours.) *Ginzburg,* 383 U.S. at 474.

The same majority in *Mishkin v. New York,* 383 U.S. 502, 16 L. Ed. 2d 56, 86 S. Ct. 958 (1966), upheld a New York conviction for producing and possessing for sale obscene books that featured sadomasochism, fetishism and homosexual practices. Admittedly aimed at appealing to "a clearly defined deviant sexual group, rather than the public at large," the court interpreted *Roth* to support the suppression of materials directed at "the sexual interests of its intended and probable recipient group".

In these three cases, the court offered a flexible "contextual" analysis to supplement the strict definitional requirements of *Roth.* In "close cases" where the elements of *Roth* as interpreted in *Memoirs* could not be satisfied, the court allowed the consideration of the circumstances of the production, sale and distribution of the alleged obscene material.

One year later in *Redrup,* the Supreme Court added two more bases which justify state control of arguably obscene materials. There, the per curiam opinion reversing three state obscenity convictions focused sharply on "contexts" where the method of distribution thrust offensive, but per-

haps not constitutionally obscene materials, upon juveniles and an unwilling public.

In none of the cases was there a claim that the statute in question reflected a specific and limited state concern for juveniles. See *Prince v. Massachusetts,* 321 U. S. 158; cf. *Butler v. Michigan,* 352 U. S. 380. In none was there any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it. Cf. *Breard v. Alexandria,* 341 U. S. 622; *Public Utilities Comm'n v. Pollak,* 343 U. S. 451. And in none was there evidence of the sort of "pandering" which the Court found significant in *Ginzburg v. United States,* 383 U. S. 463.

*Redrup,* 386 U.S. at 769.

We are satisfied that *Redrup's* emphasis on the preservation of individual privacy from the assault of offensive expression offers a reasonable and correct basis for our decision. The principal case relied upon by that court to support the privacy rationale, *Breard v. Alexandria,* 341 U.S. 622, 95 L. Ed. 1233, 71 S. Ct. 920 (1951), further delineated the scope of this contravailing right. In *Breard,* the court upheld a local ordinance requiring solicitors to obtain a homeowner's consent before entering the homeowner's premises. The claim of a magazine subscription salesman that the ordinance violated his First and Fourteenth Amendment freedoms of speech and press was denied when the court said that the guarantees of free speech and free press may not be misused to invade the privacy of one's home.

Then in *Close v. Lederle,* 424 F.2d 988 (1st Cir. 1970), *Redrup's* protection of the privacy of the home was expanded to include a university hallway. That judgment overturned a decision of a district court that the University of Massachusetts had violated the First and Fourteenth Amendment rights of one of its art instructors when it removed his controversial art display from the corridor walls of the institution. The district court had found that the embarrassment and annoyance caused by the obscene paintings were not sufficient to warrant abridgment of the

plaintiff's right of free speech. Balancing the interests of the plaintiff instructor against the rights of the users of the corridor, the court concluded that:

> Where there was, in effect, a captive audience, defendants had a right to afford protection against "assault upon individual privacy," *see* Redrup v. New York
> . . .

*Close v. Lederle*, 424 F.2d 988, 990 (1st Cir. 1970). Thus the court affirmed the university's action. It also noted that the reasonableness of the university's action was bolstered by the fact that children regularly used that particular corridor where the offensive materials had been displayed.

We are satisfied that under the circumstances of this case the defendant was rightly convicted for exhibiting an obscene motion picture film. We find that the defendant's exhibition of an arguably obscene film in close proximity to the homes and highways of the Richland community posed more than an unreasonable annoyance to the public. The record places 12 to 15 private residences and a major thoroughfare within viewing range of the theater's screen. Considering the visual content and impact of many of the film's scenes, the defendant should have known that these residents and motorists would be repeatedly and unwillingly confronted with glimpses of lurid and deviant sexual conduct as they pursued their normal activities. As noted in *Landau v. Fording*, 245 Cal. App. 2d 820, 827, 54 Cal. Rptr. 177 (1966), *aff'd per curiam*, 388 U.S. 456, 18 L. Ed. 2d 1317, 87 S. Ct. 2109 (1967):

> the visual impact of a motion picture as distinguished from other media can [not] be disregarded. Films are obviously different from other forms of expression (*Freedman v. Maryland*, 380 U.S. 51, at p. 61 . . .) . . . Even in the absence of sound, movies assure a high degree of attention and retention. . . .
> Because of the nature of the medium, we think a motion picture of sexual scenes may transcend the bounds of the constitutional guarantee long before a frank description of the same scenes in the written word.

*See also, United States v. A Motion Picture Film Entitled
"I Am Curious-Yellow",* 404 F.2d 196 (2d Cir. 1968) and
*Wagonheim v. Maryland State Bd. of Censors,* 255 Md. 297,
258 A.2d 240 (1969). To argue that the adjoining homeown-
ers and motorists in the vicinity of the outdoor theater
could have preserved their freedom to view what they
pleased by drawing their curtains or averting their eyes is
specious.

*Redrup's* reliance on *Breard* and *Pollak* suggests that an
adjustment between the rights of the disseminator and the
nonconsenting viewer should take into consideration the
public or private nature of the encounter. Perhaps the pass-
ing public motorist, experiencing only a momentary shock
and possessing the ability to avoid further embarrassment
by proceeding on his journey, suffers an incidental intru-
sion on his privacy too minor to warrant official action. But
the sanctity and immobility of the private residence sug-
gest different considerations when the homeowner is af-
fronted by lascivious conduct in the normal course of do-
mestic activities. The right of the homeowner to be free
from the intrusion of unsolicited offensive displays is ob-
viously paramount to the outdoor theater manager's abso-
lute discretion to choose what films he will exhibit to a
willing and unwilling audience. Within the confines of his
own property, a citizen should be able to select what stim-
uli he and his children will encounter. And that right of
privacy cannot be unreasonably curtailed by another citi-
zen under the guise of freedom of speech and press.

Although this court has never declared whether there is
an independent right of privacy in this state (*Lewis v.
Physicians & Dentists Credit Bureau, Inc.,* 27 Wn.2d 267,
272, 177 P.2d 896, 899 (1947), there can be little doubt
after *Griswold v. Connecticut,* 381 U.S. 479, 14 L. Ed. 2d
510, 85 S. Ct. 1678 (1965), that the right of privacy is
enshrined as a constitutional doctrine. *See* generally, W.
Prosser, Torts, § 112 (3d ed. 1964); 31 Law and Contempo-
rary Problems 251-435 (1966); 64 Mich. L. Rev. 197-288
(1965). In *Griswold,* the United States Supreme Court held

unconstitutional a Connecticut law prohibiting the use of contraceptives. Speaking for the majority (at 485), Justice Douglas found the law to be a destructive intrusion on the marital relationship, "a relationship lying within the zone of privacy created by several fundamental constitutional guarantees." Certainly the home lies within a "zone of privacy" which merits the protection of this court. And individual privacy is nowhere more entitled to protection than in the home.

We conclude that when a citizen's home is intruded upon by the unsolicited exhibition of lewd and offensive films, and there is no reasonable alternative to avoid viewing those films, such obtrusive displays violate that resident's "individual privacy" and his right to domestic solitude, and such display is contrary to RCW 9.68.010.

It may be beyond the scope of this decision to detail the concern of this court for the welfare of the teenage and pre-teenage children who viewed this film from outside the theater fence. However, we note with approval that *Stanley v. Georgia,* 394 U.S. 557, 567, 22 L. Ed. 2d 542, 89 S. Ct. 1243 (1969), reaffirms the states' duty to protect children from contact with obscene material. Because RCW 9.68.010 did not reflect "a specific and limited state concern for juveniles" when the defendant was prosecuted, *Redrup v. New York,* 386 U.S. 767, 18 L. Ed. 2d 515, 87 S. Ct. 1414 (1967) could not support our affirmance of the conviction solely on the fact that children were known to be part of the "free" audience outside the fence. But RCW 9.68 has since been amended. Laws of 1969, Ex. Ses., ch. 256, p. 2383, now provide for age restrictions on the viewing of "erotic" films. *See Interstate Circuit v. Dallas,* 390 U.S. 676, 690, 20 L. Ed. 2d 225, 88 S. Ct. 1298 (1968); *Ginsberg v. New York,* 390 U.S. 629, 639, 20 L. Ed. 2d 195, 88 S. Ct. 1274 (1968). And it is apparent that such legislation means that future "close cases" of this type will be amenable to an even broader application of *Redrup* on the basis of a "specific and limited state concern for juveniles."

We believe that the approach taken here today repre-

sents the current thinking in the area of obscenity by the highest court of our nation and offers the fairest resolution of the conflicting interests here presented. We adopt the statement of Justice Stewart, concurring in *Ginsberg,* that:

The First Amendment guarantees liberty of human expression in order to preserve in our Nation what Mr. Justice Holmes called a "free trade in ideas." To that end, the Constitution protects more than just a man's freedom to say or write or publish what he wants. It secures as well the liberty of each man to decide for himself what he will read and to what he will listen.

(Footnote omitted.) *Ginsberg,* 390 U.S. at 649.

The judgment and sentence of the trial court is affirmed.

HAMILTON, C.J., ROSELLINI and HALE, JJ., and RYAN, J. Pro Tem., concur.

FINLEY, HUNTER, and NEILL, JJ., concur in the result.

HALE, J. (concurring)—I concur except as to that part of the opinion which appears to say that material cannot be judicially held obscene unless *utterly* without social value (majority opinion, at page 263), as declared in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General,* 383 U.S. 413, 418, 16 L. Ed. 2d 1, 86 S. Ct. 975 (1966). Deciding whether the material has little or substantial social, literary, educational or entertainment value is difficult enough without trying to determine if it is *utterly* without it. After all, a seed catalog or a film travelogue can be readily converted into pornography while retaining some vestiges of social or other value. Even the filthiest, most depraved and obscene work, recognized instanter to be such by everyone of ordinary understanding, may be claimed to possess some spark of social value and thus cannot be judicially said to be *utterly* without it.

Although the Supreme Court of the United States, as is seen in the court's opinion, has the last word on freedom of speech, I think it has no jurisdiction whatever under the constitution—except perhaps for the District of Columbia —to prescribe moral, literary or social standards for the

country at large. The judicial duty to protect freedom of speech and press in the nation at large imports no correlative power to preserve obscenity and pornography in the states. "[O]bscenity is not within the area of constitutionally protected speech or press." *Roth v. United States,* 354 U.S. 476, 1 L. Ed. 2d 1498, 77 S. Ct. 1304 (1957). Accordingly, filth, whether "filth for filth's sake" or "filth for money's sake" (*State v. Jacobellis,* 173 Ohio St. 22, 28, 179 N.E.2d 777 (1962), *rev'd sub nom., Jacobellis v. Ohio,* 378 U.S. 184, 12 L. Ed. 2d 793, 84 S. Ct. 1676 (1964)), is not and should not be granted immunity from community and moral standards and state law except where to deny such immunity amounts to a deprivation of freedom of speech and press. Freedom of speech and press is not a commercial license for obscenity and pornography. Nor is obscenity and pornography protected by the commerce clause. That Congress and the federal courts do not bar the interstate transportation of filthy, obscene and pornographic movie film, does not, I think, prevent the states in their constitutional exercise of the police power from prohibiting the public sale and distribution of such materials. This is so for the same reason that allowing contaminated or adulterated foods and drugs and other consumable goods to move in interstate commerce does not override the fundamental power of the states to prohibit their sale and distribution. A different rule, I think, would constitute a direct attack on the ideas of self-government.

Holmes' aphorism that freedom of speech does not import the right falsely to shout "fire" in crowded theaters applies with equal force to pornography. Freedom of speech and press does not, I think, license the public use of pornography and obscene materials in business, commerce, politics and government.

HUNTER, J. (concurring in the result)—I concur with the result of the majority, but would go further and hold the film "Carmen Baby" to be obscene under the definitions of *Roth v. United States,* 354 U.S. 476, 1 L. Ed. 2d 1498, 77 S.

Ct. 1304 (1957). That an exhibition of the film, even to consenting adults, would be in violation of RCW 9.68.010.

We defined obscenity in *Roth* in the following terms: "[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 U.S., at 489. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.

*A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General,* 383 U.S. 413, 418, 16 L. Ed. 2d 1, 86 S. Ct. 975 (1966).

It appears that the third element of the definition has caused confusion in the application of this definition.

I find no such problem. The definition should be considered in its entirety. The third element should not be considered in isolation of the remainder of the definition. If the material, taken as a whole, appeals to the prurient interest in sex, and is patently offensive because it affronts contemporary community standards relating to the representation of sexual matters, then whether or not the material is utterly without redeeming social value, should be determined in the light of contemporary standards of the community.

Because there may be some in a community who disagree with the contemporary standards and, in their opinion, deem the material to have some redeeming social value, does not by itself remove that material from the definition of obscenity.

In the instant case the film "Carmen Baby" was exhibited to this court. It became indisputed evidence in the case. Therefore, this court is in as favorable a position as the trial court to make a valued judgment and independent judicial determination as to whether this film is utterly without redeeming social value.

To detail the repulsive, erotic, pornographic scenes that dominate the entire theme of this film is unnecessary to this opinion. The majority unhesitatingly state:

> We necessarily viewed the film and found it personally distasteful, offensive and *devoid of social,* philosophical or artistic merit.

(Italics mine.)

Why then should the opinion of some witnesses in the record modify the opinion of the members of this court. To do so unqualifiedly would be to allow their usurpation of a judicial function.

This court must make the final determination as to whether the film "Carmen Baby," the undisputed evidence in this case, comes within the *Roth* definition and is obscene. Unquestionably the dominant theme of the film appeals to the prurient interest in sex. We can take judicial notice that it does affront contemporary community standards. Applying these standards, it is utterly without any redeeming social value.

This court therefore should, without equivocation, hold that the film is obscene, and any exhibition thereof, even to consenting adults, is in violation of the statute, RCW 9.68.010, *supra.*

FINLEY, J. (concurring in the result)—I have some lingering reservations as to the constitutionality of the procedure employed in seizing the questioned film—*i.e.,* the lack of a prior adversary hearing on the question of obscenity. I nevertheless concur in the result reached by the majority on the ground that exhibition of the film "Carmen Baby" under the specific facts of this case—*i.e.,* in a location unrestrictedly frequented by juveniles—does not fall within the constitutional protection of the first amendment to the United States Constitution. Furthermore, in my opinion, the facts surrounding exhibition of the film "Carmen Baby" in the case before us support a finding of pandering on the part of the appellant as to those minors who actually viewed the film.[2] It is obvious from the record that the

---

[2] Pandering may be found to exist, as I understand the relevant federal cases, when the questioned material is "created or exploited

appellant made no attempt to restrict viewing of the film by juveniles immediately outside the chain link fence. Such inaction was potentially an economic benefit to appellant in serving to attract juveniles to become paying customers and with a somewhat logically predictable result the juveniles as "free" customers would, by word-of-mouth, attract additional paying customers.

It appears to me that, perhaps, the majority assumes too much in applying, or, possibly, in attempting to extend the application of, the contextual or variable approach developed in *Redrup v. New York*, 386 U.S. 767, 18 L. Ed. 2d 515, 87 S. Ct. 1414 (1967), and *Close v. Lederle*, 424 F.2d 988 (1st Cir. 1970). Namely, the facts of the instant case do not, in my opinion, support the finding of an assault upon individual privacy "in a manner so obtrusive as to make it *impossible* for an unwilling individual to avoid exposure to it" such as described in *Redrup* and *Close*.

While I can agree with, and would support, application of the "contextual" approach in an appropriate case, as I read the record before us, it is silent or lacking as to any complaints actually made by motorists or residents of the area, and thus there seems to be no indication that, in fact, *the individual privacy of any homeowner or passing motorist was assaulted*. Decisions of the federal courts in the area here involved seem to me to indicate that the First Amendment rights cannot be circumscribed absent clear proof of an *actual assault* upon the rights of a nonconsenting individual.

Finally, in terms of the foregoing, it appears to me the rationale of *Redrup* and *Close* may be somewhat misapplied in the following passage from the majority opinion:

The right of the homeowner to be free from the intrusion

---

entirely on the basis of its appeal to prurient interests . . ." *Ginzburg v. United States*, 383 U.S. 463, 474, 16 L. Ed. 2d 31, 86 S. Ct. 942 (1966). Where the relevant evidence supports a finding that a solicitor's or exhibitor's actions amount to pandering, "*such evidence may support the determination that the material is obscene even though in other contexts the material would escape such condemnation.*" (Italics mine.) *Ginzburg*, 383 U.S. at 476.

of unsolicited offensive displays is obviously paramount to the outdoor theater manager's absolute discretion to choose what films he will exhibit to a willing and unwilling audience.

It is my feeling this statement would be more appropriate if there had been complaints or were this an action for nuisance brought by offended homeowners. This particular language in this case does not, in my opinion, sustain censure of the film absent proof of actual assault upon the privacy of a specific individual.

In any event, for the reasons stated, I concur in the result reached by the majority.

NEILL, J., concurs with FINLEY, J.