CINEMA CLASSICS, LTD., Inc., a California corporation, et al., Plaintiffs,

v.

Joseph P. BUSCH, Jr., District Attorney for the County of Los Angeles, State of California, et al., Defendants.

No. 72–30.

United States District Court,
C. D. California.

Feb. 22, 1972.

Stanley Fleishman, Hollywood, Cal., for plaintiffs.

John D. Maharg, Los Angeles County Counsel by Michael H. Dougherty, Deputy County Counsel, Los Angeles, Cal., for defendants Busch, Pitchess, Hippler, Kenneally, Nottingham, George and Jordan.

Roger Arnegergh, City Atty. of Los Angeles by David M. Schacter, Deputy City Atty., Los Angeles, Cal., for defendants Davis, Weller and Minton.

Before ELY, Circuit Judge, and CURTIS and HILL, District Judges.

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

IRVING HILL, District Judge:

The Court heard argument on the said motion and has considered the various documents and affidavits filed in support of the motion and in opposition thereto, and has determined to grant Plaintiffs a preliminary injunction, the terms of which are specified hereinafter.

All findings of fact and conclusions of law herein made are made only on the basis of the facts as they now appear to us and without prejudice to the urging of contrary facts and legal conclusions at the trial of the case.

Plaintiffs are five corporations which appear to be interconnected to some degree through common officers and directors. All are housed in a single place of business on Pico Boulevard in Los Angeles. They are engaged in various aspects of the publication and distribution of sexually oriented materials including motion pictures, books, maga-

zines, playing cards, etc. They sue various officials and law enforcement officers of Los Angeles County including its District Attorney, Sheriff, a Deputy District Attorney and a number of Deputy Sheriffs. They also sue the Los Angeles City Police Chief and two of his officers. The complaint asserts a number of grounds of federal jurisdiction including (1) the Civil Rights Acts, 42 U.S.C. § 1983ff., and (2) the unconstitutionality of Sections 1523–1542, inclusive, of the California Penal Code. These latter statutes govern both the issuance, service and execution of search warrants and the post-execution remedies for the suppression or return of improperly seized materials.

The action arises out of two separate searches and seizures which occurred at the premises jointly occupied by the Plaintiffs, one on December 29, 1971, and the other on January 11, 1972. The first was carried out by the Defendants employed by the City of Los Angeles and the second by Defendants employed by the County.

Before making ultimate findings of fact concerning these seizures and applying the law to those ultimate findings, it is appropriate to set forth in some detail the facts surrounding each seizure as the facts now appear.

The December seizure was made pursuant to a warrant issued by a Judge of the California Superior Court. There is no indication that he was shown any of Plaintiffs' materials before signing it. It authorized "entry into the . . . business building [occupied by the Plaintiffs] including all rooms, attics, basements and other parts therein, the surrounding grounds and any out buildings attached or unattached, located thereon."

The warrant authorized the seizure of all motion picture films, all still pictures and any undeveloped film and negatives "in quantity which would show the intent for sale and distribution" and which depicted "acts of oral copulation, masturbation, sexual intercourse, sodomy or sexual acts between humans and animals." It directed entry into "all storage areas, desks, filing cabinets and safes or any containers, where such films, pictures, negatives and undeveloped film may be found." It further directed the seizure of "any business records, cancelled checks, receipts showing the sales or distribution or payment of processing films and payment to people participating [therein]."

The only affidavit upon which the warrant was issued was one made by a police officer, Defendant Weller. The affidavit does not claim that the affiant obtained any film or picture by purchase or otherwise from Plaintiffs. It does not claim that the affiant had viewed any film or picture originating with Plaintiffs. It asserts that twenty-seven titles of motion pictures were seized from another location in a neighboring city twelve days earlier, which films were "believed" to have come originally from Plaintiffs' premises. It says that said films had been viewed by a Municipal Judge who stated that in his opinion the films were obscene. The affiant attached to his affidavit some order forms which he said were those of Plaintiffs although they show an entirely different address thereon. Each order form is accompanied by a number of still pictures, purportedly one frame from each of several films. In each case, the one frame shows a copulative act of two, three or four persons. There is no description of the films involved anywhere in the affidavit except the titles given to them on the order form. Typical of these titles are "#42 Young Girl is Raped by Two Men, Shocking," "#43 Black Rape. Black Man and a Blonde," "#46 a Young Girl Makes it with a Shetland Pony."

The warrant was served in an unannounced expedition consisting of approximately eleven police officers who were on the premises about eight hours and apparently arrived with trucks. In a news story one of the supervising police officers is quoted as boasting that the police took possession of "still and motion picture film valued at more than $1.5 million . . . ."

There are some disputes of fact dealing with minor matters in the affidavits furnished to us. But certain facts are clearly established. The officers executing the warrant seized and took approximately 13,000 reels of motion picture film, including the master negatives of four films. Up to 500 copies of the same film were seized. All of the motion picture films on the premises were seized and none was left. Plaintiffs claim that the officers did not view any of the films prior to seizing them. Giving maximum credibility to the affidavits of the police, it appears that, at most, only random and cursory attempts were made to determine whether the materials seized conformed to the specification of the warrant [1] and that most of the films seized were not viewed at all.

The approximately 25 employees on the premises were kept standing in a single small room estimated to be eight feet by ten feet for about 45 minutes. Purses of women employees were examined. Papers, records and documents, including metered and sealed mail, were seized, apparently without prior examination, and thrown at random into boxes and carried away. The Secretary of one of Plaintiff corporations says that "virtually all of its business records necessary for the conduct of its business" were taken. And this claim is not denied.

While the operation was going on, representatives of the various communications media, including persons with radio and television equipment, came to the premises to describe and take pictures of what was happening.

This massive seizure took place more than six weeks ago. No arrest has yet been made of any person resulting from this seizure nor has any criminal case apparently been commenced as a result thereof. The city authorities have not compiled, or at least have not yet supplied us, an intelligible inventory of the materials seized.

Now to the facts of the second seizure. On January 11, 1972, thirteen days after the first seizure, a different set of law officers appeared armed with a different warrant. The officers who appeared were approximately ten deputy sheriffs of the Los Angeles Sheriff's Department, accompanied by a Deputy District Attorney. The warrant was one issued by a Municipal Court Judge. The warrant was quite limited in the description of what could be seized thereunder. It permitted the seizure of "eight millimeter color and or black and white films which are sexually oriented and which depict specific acts of oral copulation, sexual intercourse and masturbation together with any or all brochures and any advertising matter describing said films and any or all said blanks, business forms and other business records which might tend to show the identity of the operator of the business . . ."

We have not been furnished with any affidavit which underlies the said warrant. As far as we know, there was none. But we do have the affidavit of Deputy Sheriff Nottingham who apparently procured the issuance of the warrant. He states that the warrant was based upon his having ordered and received one film for $40 which he characterizes as "hard-core pornography" but does not otherwise describe. He says that he received, with the film, eight brochures containing "many photographs of actual sexual acts." The brochures, Nottingham alleges, also offered various printed materials and sexual appliances for sale.

The officers took about four and one-half hours to execute this warrant. They seized approximately 3,900 reels of motion picture film and over 100,000 brochures. Plaintiffs claim that their entire stock in trade was taken both as to

---

[1]. As to films, the only specific information about the examination made on the premises is furnished by the affidavit of Defendant Weller. He says that in "many" cases he decided to seize a film by looking at a still picture on the box containing the film. He asserts, without any proof, that in each instance the one photograph depicted "the type of activity . . . on the film."

films and other printed material. Defendants do not deny taking all of the films on the premises. They have furnished us an inventory showing that dozens and in some instances hundreds of copies of given films were taken. Defendants claim to have left some brochures on the premises.

The officers went beyond the language of the warrant and also seized about 16,000 still photographs, about 1,250 packs of playing cards, all of the same printing, and thousands of transparencies and negatives. In addition, there was seized what Plaintiffs describe as all of the insurance policies, tax returns, payment records, accounts receivable and payroll records, W–2 forms, copyright certificates, ledgers and all other records on the premises connected with any of the businesses housed there. As Plaintiffs' affidavits put it, the seizure of business records on this occasion involved the seizure of papers and documents indiscriminately from filing cabinets and desk drawers with them being thrown into boxes "without any effort being made to determine what was being seized or to make any record of what was seized." Defendants' affidavits, especially those of Deputy Sheriff Greenlees and Deputy Sheriff Hippler, who directed the operation, do not really deny these claims. Mr. Hippler claims that the only records that were seized were those that "show on their face they have something to do with the business . . ." He admits to seizing employee records because he "felt because of the nature of plaintiffs' business employees could be charged with violations . . ." of the California laws.

Not only was there no real examination of the business records seized, it is evident that there was no real examination made of the pictorial material which was seized. Some still pictures were viewed, apparently very few. No films were exhibited on a projector before seizure. In a few instances, a few feet of film was examined with a magnifying glass.

There has been only one arrest as a result of the second seizure, namely the arrest of the President of one of the Plaintiff corporations. He has been charged with one misdemeanor count under California Penal Code § 311.2.

Now to the ultimate facts found. The only apt description of each seizure is to term it a raid. What occurred is reminiscent of the big-city raids on speakeasies and bootleg distilleries as they are described in the movies and literature of the Prohibition Era. These raids and seizures were undertaken for the twin purposes of putting Plaintiffs out of business [2] and censoring and preventing the circulation of great quantities of sexually oriented, pictorial materials. The seizures, and each of them, involve harassment and bad faith on the part of Defendants. Plaintiffs will be irreparably injured and will suffer great and immediate harm if the material seized (less what is reasonably necessary to be retained as evidence of possible criminal conduct) is not promptly returned to them.

## LEGAL DISCUSSION

Plaintiffs make two contentions which we mention only in passing. They argue that a seizure is *per se* unconstitutional when made pursuant to a warrant as generally worded as the warrants used in the instant case. Plaintiffs contend that the warrants contain no specific identification of the items to be seized and were issued without either of the issuing Magistrates having seen any of the materials to be seized. Plaintiffs point out that the general wording used in these warrants would permit the seizure, en masse, of material which well might fall outside any accepted definition of obscenity. They contend, for in-

2. The affidavit of the President of one of Plaintiff corporations alleges that a supervising officer of the Sheriff's Department told him that he would return for similar searches in the future and would "put all of the companies located at the said premises out of business." This allegation is not denied (nor admitted) in any defense affidavit.

stance, that not every visual representation of human sexual intercourse is obscene, citing United States v. 33 MM. Motion Picture Film "Language of Love", 432 F.2d 705 (2nd Cir. 1970). Yet, they argue, the language of the warrant would permit the seizure of any and all such visual representations. Secondly, Plaintiffs argue that even if the language of the warrants is constitutionally proper, the actual seizures made on each occasion were substantially in excess of the property described in the warrants and thus became unconstitutional seizures.

These contentions of Plaintiffs involve us in gray areas of the law, areas in which we have no clear guidance from higher Courts. Therefore, we do not rest our decision on either contention and will not discuss either contention further. We can and do decide the matter on other grounds.

■■■ Under existing decisions, the material in question in this case is presumptively within the protection of the First Amendment. A mass seizure of such material, without a prior adversary hearing and a determination therein that the material is obscene, constitutes a prior restraint on the circulation of presumptively protected material and, as such, violates the federal Constitution. A Quantity of Books et al. v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); Potwora v. Dillon, 386 F.2d 74 (2nd Cir. 1967); Metzger v. Pearcy, 393 F.2d 202 (7th Cir. 1968); cf. Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). See Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1964); Dyson v. Stein, 401 U.S. 200, 204, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971) (concurring opinion of Mr. Justice Brennan). The proper remedy for such illegal action, and, indeed, the only feasible way to undo the effects of an illegal prior restraint on

circulation, is to return the material seized or, at minimum, to return it less a small amount needed as evidence of possible criminal violations. Potwora v. Dillon, supra; Metzger v. Pearcy, supra; cf. G. I. Distributors, Inc. v. Murphy, 336 F.Supp. 1036 (S.D.N.Y. January 19, 1972); see In Re Louisiana News Co., 187 F.Supp. 241 (E.D.La.1960).

We do not mean to say that a prior adversary hearing is necessary before seizure of a small quantity of allegedly obscene material, i. e., a quantity reasonably necessary for use as evidence of possible criminal violations. Whether or not a prior adversary hearing is required in such cases is, at least in our Circuit, a moot question [3] on which we may soon receive further guidance from the United States Supreme Court in a case pending before it, State v. Rabe, 79 Wash. 2d 254, 484 P.2d 917 (1971), cert. granted Rabe v. Washington at 404 U.S. 909, 92 S.Ct. 228, 30 L.Ed.2d 181 (1971). But we have no doubt that the requirement for such a prior adversary hearing in a case of mass seizures, as enunciated in Quantity of Books, supra, is still, and should be, the law. We note that Quantity of Books, supra, has been repeatedly cited with approval by the Supreme Court since it was announced. See, e. g., Stanford v. Texas, 379 U.S. 476, 486, 85 S.Ct. 506, 13 L.Ed.2d 431 (1964); Freedman v. Maryland, 380 U.S. 51, 58, 85 S. Ct. 734, 13 L.Ed.2d 649 (1964); Dyson v. Stein, 401 U.S. 200, 204, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971) (concurring opinion of Mr. Justice Brennan).

■■ ■■ Defendants assert that they have the right to retain all of the materials seized regardless of the legality of the warrants or the legality or illegality of the manner in which they were executed. They assert this right of retention on the theory that the materials seized are "contraband." This argument must be rejected. There are California decisions which, in their lan-

3. See Demich, Inc. v. Ferdon, 426 F.2d 643 (9th Cir. 1970), vacated and remanded sub. nom Ferdon v. Demich, Inc., 401 U.S. 990, 91 S.Ct. 1223, 28 L.Ed.2d 528 (1971).

guage, equate the seizure and retention of allegedly obscene materials with the law as it has developed in connection with other types of contraband such as narcotics, gambling paraphernalia, burglars' tools and intoxicating liquor. *See,* e. g., Aday v. Superior Court, 55 C.2d 789, 800, 13 Cal.Rptr. 415, 362 P.2d 47 (1961). But this equation and this characterization will not stand analysis. True contraband of the types mentioned can be quickly and easily recognized by officers operating in the field. Even as to narcotics, relatively simple field tests can be made. No simple tests exist to determine obscenity. Allegedly obscene materials are things used for the communication of ideas and partake of First Amendment characteristics far more than they do the characteristics of traditional contraband. Because they are presumptively First Amendment materials and are not easily recognizable, the same breadth of official action concerning their seizure and retention cannot be tolerated as is permitted in the case of true contraband. We believe the Supreme Court in Marcus v. Search Warrant, *supra,* has implicitly rejected Defendants' argument and we reject it.

Defendants argue that even though we regard the instant seizures as unconstitutional, we should abstain from acting on two separate grounds. First, Defendants argue that for us to grant a preliminary injunction requiring return of the material seized would violate the principles announced by the United States Supreme Court in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L. Ed.2d 669 (1971), and the companion cases decided the same date, e. g., Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L. Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971). Secondly, they argue for abstention on the ground that California law,

particularly Penal Code Section 1538.5, provides a prompt and effective remedy to question the constitutionality of a mass seizure and to obtain the return of the materials seized if the seizure was unlawful. Therefore, they argue, we should defer to the California courts.[4]

Our action in granting a preliminary injunction ordering the return of most of the material seized does not, in our view, violate the principles of *Younger* and its companion cases. *Younger* proscribes, except in narrow and specific circumstances, the issuance of a federal injunction halting pending state criminal prosecutions. Our injunction will have no such effect. Our injunction will in no way halt, ·inhibit, prejudice, or handicap the state in the prosecution of the one misdemeanor prosecution now pending or any other prosecution that may later be commenced. Defendants will be left with ample copies of each item seized to use as evidence in any criminal case they may choose to bring. Clearly, Defendants do not need to retain *each and every* copy of the great mass of material seized in order to prove an intent to distribute. They have plenty of eye witnesses who can testify as to the quantities seized and they must, by now, have taken ample photographs and gathered other data which demonstrate the mass of the material found on Plaintiffs' premises.

Even if the *Younger* rationale is somehow to be extended to require abstention in cases where, as here, large quantities of presumptively protected items are taken and where, as here, there is no injunction or other federal interference in connection with pending or future state criminal prosecutions, the instant case would fall outside the *Younger* rule. *Cf.* Wulp v. Corcoran, 1st Cir., 454 F.2d 826, decided January 11, 1972. The *Younger* doctrine permits federal intervention when it appears that the acts of the law enforcement officials consti-

---

4. We are informed that Plaintiffs have already filed a proceeding under Penal Code Section 1538.5 to obtain return of the material, although such hearing had not been held as of the date the application for preliminary injunction was argued before us.

tute bad faith and harassment and where irreparable harm will result. We have made just such findings here.

We have given much thought to the second ground for abstention, i. e., the existence of Penal Code Section 1538.5 as a prompt and effective remedy. We are willing to assume, *arguendo*, that the existence of a post-seizure procedure for a quick and final hearing and adjudication in the state courts, as to both the obscenity of the material seized and the validity of the warrant and seizure, might be a constitutionally valid substitute for the prior adversary hearing required by *Quantity of Books, supra.* Such an assumption carries us beyond any clear precedent from the United States Supreme Court or any Circuit. But even making such an assumption, under the facts of this case we are unwilling to abstain and relegate Plaintiffs to the remedy of Section 1538.5 because we have grave doubts that the remedy therein provided is an adequate one. Section 1538.5 has many of the flaws the Supreme Court found in the Maryland statute in Freedman v. Maryland, *supra*,[5] and few of the virtues the Supreme Court found in the New York statute in Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1956).

First, there is no time limit within which the 1538.5 hearing must be heard and decided. Without a stringent time limit, the prior restraint on the circulation of presumptively protected materials cannot effectively be minimized or controlled. Secondly, the statute imposes no burden on the law enforcement authorities to initiate the proceeding. Thus, whether it is initiated or not may well depend upon the wealth and stamina of the person from whom the materials were seized. Third, the burden of proving that the material is not obscene, or proving any other issue raised, appears to be on the victim of the seizure and not on the law enforcement authorities.[6] In view of the important Constitutional values involved, a statute imposing on the owner both the burden of initiating the proceeding and carrying the initial burden of proof therein may not constitute a sufficiently effective remedy. *See* Freedman v. Maryland, *supra;* Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); United States v. Thirty-Seven Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); Potwora v. Dillon, *supra.*

We wish to stop short of a flat unequivocal holding that Section 1538.5 is unconstitutional. We recognize that the statute is relatively new. Literally read, it contains all of the flaws above mentioned. In a few cases, the California Appellate Courts have had the opportunity to construe the statute in the context of allegedly obscene materials.[7] But those Courts have thus far made no construction of the statute that would eliminate the defects we have mentioned although the cases seemed to afford an opportunity for such beneficial construction of the statute. In future cases the California Courts may possibly remedy some of the defects mentioned above by a process of statutory construction. However, it is unlikely that the statute could conceivably be read to impose the burden of going forward on the seizing authorities. In any event, such a process of statutory construction might well take a very long time. The exigencies of this case are with us now. We have a duty to act expeditiously to grant the limited relief we have determined must be

---

5. It contains many of the flaws Judge Friendly found in the statute in question in *Potwora, supra.* We note that our decision here is essentially the same kind of limited relief Judge Friendly granted in that case.

6. *See* People v. Bonanza Printing Co., 271 Cal.App.2d Supp. 871, 76 Cal.Rptr. 379 (1969).

7. *See*, e. g., People v. deRenzy, 275 Cal. App.2d 380, 79 Cal.Rptr. 777 (1969); People v. Chapman, 17 Cal.App.3d 865, 95 Cal.Rptr. 242 (1971); Monica Theater v. Municipal Court, 9 Cal.App.3d 1, 88 Cal.Rptr. 71 (1970); People v. Bonanza Printing Co., *supra.*

granted in this case. We decline to abstain.

## DESCRIPTION OF PARTICULAR RELIEF TO BE GRANTED

The Trial Judge has already granted a temporary restraining order requiring the return of all business records seized, with the seizing authorities having the right to make copies of those thought to have evidentiary value for the purposes of any criminal case. We will grant a preliminary injunction embodying the following provisions:

1. Return to Plaintiffs all business and personal records seized by Defendants and not yet returned.

2. Return to Plaintiffs all sealed, first-class mail which was seized.

3. Return to Plaintiffs all of the still photographs seized from Plaintiffs' premises, less three copies of each photograph that Defendants believe may have evidentiary value in connection with any pending or proposed criminal proceeding. Negatives and transparencies seized shall also be returned subject to Defendants' right, at Plaintiffs' expense, to produce three prints of each in the event prints thereof are not otherwise available. Such prints shall be promptly made.

4. Return all decks of playing cards seized from Plaintiffs' premises less three copies of each printing which Defendants believe may have evidentiary value in connection with any pending or proposed criminal proceeding.

5. Return all brochures and order forms seized from Plaintiffs' premises less three copies of each document which Defendants believe may have evidentiary value in connection with any pending or proposed criminal proceeding.

6. Return all motion picture films seized from Plaintiffs' premises less three copies of each film which Defendants believe may have evidentiary value in connection with any pending or proposed criminal proceeding. Film negatives shall also be returned subject to Defendants' right, at Plaintiffs' expense, to produce three prints thereof in event such prints are not otherwise available. Such prints shall be promptly made.

We are also asked to enjoin Defendants from conducting any further intrusions or seizures on Plaintiffs' premises. We decline to do so, the threat of any such future action being not clearly shown.

A formal preliminary injunction has been signed and is ordered filed contemporaneously with the filing of this Order. The Clerk is ordered to serve a copy of both documents by United States mail on counsel for all parties.

It is appropriate to say one last word. The few samples which we have seen of the material involved in this case clearly exceed the boundaries of good taste. We do not express any opinion on whether or not they are obscene. Confronted with them, most people would probably express sentiments similar to our own as to their obnoxiousness. But constitutional principles are meant for the protection of the unpopular and the obnoxious. If the materials are found to be obscene, there are adequate remedies under the criminal laws of both the states and federal Government to punish those responsible for their circulation. But censorship in advance of such a finding is not permitted. Nor is a mass police raid undertaken without due process for the purpose of punishing those who publish materials found hateful by a majority of the citizens.

The censor and the illegal police raiding party are even less welcome in this country than the peddler of execrable sex materials, and with good cause. If such activity as appears in the instant case is not promptly rebuked and redressed, who will call an eventual halt, and where will it be called, when the civil liberties of all the citizens become more and more eroded in the name of "decency?"