[Civ. No. 22920.   First Dist., Div. Two.   Oct. 24, 1966.]

SAUL LANDAU, Plaintiff and Appellant, v. ADDISON FORDING, as Chief of Police, etc., et al., Defendants and Respondents.

Johnston & Platt, Neil F. Horton, Albert M. Bendich and Marshall W. Krause for Plaintiff and Appellant.

Robert T. Anderson and Robert P. Berkman for Defendants and Respondents.

TAYLOR, J.—The only question presented on this appeal is whether the trial court properly found that "Un Chant d'Amour," a film written and directed by Jean Genet, was obscene within the meaning of section 311, subdivision (a), of the Penal Code and, therefore, excluded from the constitutional guarantees of freedom of speech and of the press.

The pertinent facts are not in dispute. Appellant, Saul Landau, was authorized by the New York distributor to exhibit the film in the San Francisco Bay Area. Appellant shared the proceeds derived from such exhibitions with the San Francisco Mime Troupe, an unincorporated association. Under his agreement with the New York distributor, appellant was not entitled to exhibit the film at commercial movie houses catering to a general movie audience.

Prior to the instant proceeding, appellant had exhibited the film in Santa Barbara (before an audience comprised mainly of people from the Center for the Study of Democratic Institutions), in San Francisco at several private showings, at San Francisco State College, in several art movie houses in San Francisco, and in Berkeley at Stiles Hall, the University Y.M.C.A. After appellant sought to show the film a second time in Berkeley, his agent was advised by respondent Bergfeld, the director of the special investigations bureau of the police department, that the next time the film was exhibited in Berkeley, it would be confiscated and all persons responsible arrested. In so advising the agent of appellant, respondent Bergfeld acted as the agent of the Berkeley Police Department headed by respondent Fording.

Thereafter, appellant instituted this action for declaratory

relief. At the trial of the action, the trial court, in order to determine the artistic value and social importance of the film, admitted the testimony of seven expert witnesses called by appellant[1] as well as its own expert witness[2] over the repeated objections of respondents who chose not to present any evidence, but argued that the court had to base its conclusions on the film alone. All of appellant's witnesses had different views as to the theme of the film, and while contending that it was not hard-core pornography, they agreed that the film should not be shown over television or in commercial motion picture theatres.

The trial court twice viewed the film and found that to the average person applying contemporary community standards, the predominant appeal of the film as a whole was to prurient interests, i.e., a shameful and morbid interest in nudity and sex, substantially beyond customary limits of candor in the description or representation of such matters. The court further found that the film explicitly and vividly revealed acts of masturbation, oral copulation, the infamous crime against nature (sodomy), voyeurism, nudity, sadism, masochism and sex and that it was "nothing more than cheap pornography calculated to promote homosexuality, perversion, and morbid sex practices," that it fell "far short of dealing with homosexuality, perversion, masturbation or sex from the scientific, historical or critical point of view," was completely lacking in the exposition of any ideas of social importance, and had no value as art or otherwise to give it redeeming social importance and thus obtain the benefit of the constitutional guarantees.

Accordingly, the court concluded that: the film was obscene within the meaning of section 311, subdivision (a), of the Penal Code; therefore, any exhibition or showing thereof would be in violation of section 311.2 of the Penal Code, and any person showing the film would not be able to claim as a defense that the exhibition was in aid of legitimate scientific

---

[1]The witnesses for appellant were: James Kerans, lecturer on dramatic literature and theory of the University of California, Berkeley; Irving Saraf, director of film programming for television station KQED; Mark Linenthal, assistant director of the Poetry Center of San Francisco State College; Jackson Burgess, novelist, film critic and professor of English at the University of California, Berkeley; Susan Sontag, novelist and film critic; Jan Marinissen, rehabilitation secretary of the American Friends Service Committee; Dr. Bernard L. Diamond, professor of criminology and law at the University of California, Berkeley.

[2]The court called as its own expert witness Dr. Charles W. Merrifield, professor of social science and the head of the Social and Behaviorial Sciences at California State College, Hayward.

or educational purposes within the meaning of section 311.8 of the Penal Code. This appeal is from the judgment entered in favor of respondents.

■ While motion pictures, like other forms of expression, are within the ambit of the constitutional guarantees of freedom of speech and of the press (*Joseph Burstyn, Inc.* v. *Wilson,* 343 U.S. 495 [96 L.Ed. 1098, 72 S.Ct. 777]), obscenity is not subject to those guarantees (*Roth* v. *United States,* 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304]).

Section 311, subdivision (a), of the Penal Code provides: " 'Obscene' means that to the average person, applying contemporary standards, the predominant appeal of the matter, taken as a whole, is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion, which goes substantially beyond customary limits of candor in description or representation of such matters and is matter which is utterly without redeeming social importance."

The statute was the codification of the definition of obscenity announced by the U.S. Supreme Court in *Roth* v. *United States, supra* (*Zeitlin* v. *Arnebergh,* 59 Cal.2d 901, 918-919 [31 Cal.Rptr. 800, 383 P.2d 152]). The section, in substance, prohibits "hard-core" pornography (*Zeitlin* v. *Arnebergh, supra,* at p. 919). The U. S. Supreme Court has not yet determined whether *Roth* and the subsequent cases are limited to "hard-core" pornography.[3] (*Manual Enterprises, Inc.* v. *Day,* 370 U.S. 478, 489 [8 L.Ed.2d 639, 82 S.Ct. 1432]). In its most recent opinion dealing with a film, the U. S. Supreme Court said: "We would reiterate, however, our recognition in *Roth* that obscenity is excluded from the constitutional protection only because it is 'utterly without redeeming social importance,' and that 'the portrayal of sex, e.g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press.' *Id.* at 484, 487. It follows that material dealing with sex in a manner that advocates ideas, *Kingsley Intl. Pictures Corp.* v. *Regents of University of New York State,* 360 U.S. 684 [3 L.Ed.2d 1512, 79 S.Ct. 1362], or that has literary

[3]Significantly, only in a few cases, notably *Manual Enterprises* v. *Day,* 370 U.S. 478 [8 L.Ed.2d 639, 82 S.Ct. 1432], *Jacobellis* v. *Ohio,* 378 U.S. 184 [12 L.Ed.2d 793, 84 S.Ct. 1676], and *A Book etc. Memoirs* v. *Attorney General of Massachusetts,* 383 U.S. 413 [16 L.Ed.2d 1, 86 S.Ct. 975], was the court ever required to apply its standards to the materials in question. In all of the other cases, because the issue before the court was the constitutionality of a particular statute, the issue of the obscenity of the material itself was either assumed or not discussed.

or scientific or artistic value or any other form of social importance, may not be branded as obscenity and denied the constitutional protection. Nor may the constitutional status of the material be made to turn on a 'weighing' of its social importance against its prurient appeal, for a work cannot be proscribed unless it is 'utterly' without social importance." (*Jacobellis* v. *Ohio*, 378 U.S. 184, at p. 191 [12 L.Ed.2d 793, 84 S.Ct. 1676].)

The *Jacobellis* opinion also indicated that the applicable contemporary community standard is not that of the local community where the case arises, but a national standard (*supra*, pp. 192-195). The most recent decisions of the U.S. Supreme Court affirm the requirement that the elements of obscenity defined in *Roth* must coalesce, that there will be no balancing of "social importance" against the other elements (*A Book etc. Memoirs* v. *Attorney General of Massachusetts*, 383 U.S. 413, 419 [16 L.Ed.2d 1, 86 S.Ct. 975]), and announced a new doctrine, namely, that evidence that material was commercially exploited for the sake of prurient appeal to the exclusion of all other values would justify the conclusion that the material was utterly without redeeming social importance (*Ginzburg* v. *United States*, 383 U.S. 463, 470-473 [16 L.Ed.2d 31, 86 S.Ct. 942]; *Mishkin* v. *New York*, 383 U.S. 502 [16 L.Ed.2d 56, 86 S.Ct. 958]), *Ginzburg* and *Mishkin* indicating that apart from the nature of the material, the conduct of the disseminator and the commercial context in which the dissemination occurs are significant.

We first dispose of respondents' contention that the trial court erred in admitting the testimony of the expert witnesses and in failing to base its conclusions solely on the viewing of the film. The question here presented is not one of fact alone but is mixed with a determination of law (*Zeitlin* v. *Arnebergh*, 59 Cal.2d 901 at p. 910 [31 Cal.Rptr. 800, 383 P.2d 152]). The court must make an independent judgment as to whether the *material involved is constitutionally protected* (*Jacobellis* v. *Ohio, supra*, p. 190.) In almost every field of the law, expert testimony is permitted on subjects concerning which the judge or administrator has no specialized competence. So here, the lower court properly received evidence to assist in the determination of contemporary community standards as well as the artistic merit and social importance of the film (*Smith* v. *California*, 361 U.S. 147 at pp. 157, 166-167 [4 L.Ed.2d 205, 80 S.Ct. 215]).

The principal question is whether "Un Chant d'Amour"

satisfies the test of obscenity established by our statute and the decisions of the U. S. Supreme Court. Before exploring the "dim and uncertain" line that often separates obscenity from a constitutionally protected expression (*Bantam Books, Inc.* v. *Sullivan,* 372 U.S. 58, 66 [9 L.Ed.2d 584, 83 S.Ct. 631]), we give a description of the film which was viewed in its entirety by the justices of this court.

"Un Chant d'Amour" is an 8mm. silent film of about 30 minutes' duration made in the style of the short silent films of the 1920's and apparently deliberately ambiguous. No music or text accompanies the film. The actors are professionals. The picture was made with artificial lighting on autochromatic film which is blind to red so that almost all of the grays are eliminated. The resultant strong contrasts between dark and light create a particularly visual impact.

The setting is an unnamed prison cell block in an unnamed place. The principal characters are a guard and four prisoners. At the outset, the guard is walking outside the prison walls. Each prisoner is alone in his cell engaging in various acts of self-love and masturbation. The prisoners are also shown communicating with each other by knocking on the walls and by the passage of a straw through a hole in the thick wall between the cells, and the blowing of smoke through a straw. Two of the prisoners are clearly involved in a homosexual relationship. The guard in the course of his duties looks into each of the individual cells through peep holes and observes the prisoners. Their acts of sexual perversion and particularly the conduct of one hairy-chested prisoner arouses the guard's voyeuristic and latent homosexual tendencies. The film reaches a climactic ending in a sadistic beating of the hairy-chested prisoner by the algolagnic guard. In the last scene, the guard is again walking outside the prison wall.

In the last half of the film, the realistic scenes in the prison are interspersed with three series of brief recurring fantasy scenes that may or may not be the fantasy of some or only one of the characters. In the first series, two hands emerge from their individual barred cell windows and one hand attempts unsuccessfully to throw a garland of flowers to the other. Toward the end of the film, the garland is caught. In the second series of fantasy scenes (most likely those of one or both of the prisoners who are homosexually involved with each other), the prisoners are playing together in a romantic sunlit wood. During the third series (most likely those of the guard during the beating), two male heads are seen passionately kiss-

ing; two male torsos appear in various positions depicting fellatio, sodomy and oral copulation. The fantasy scenes increase in intensity during the film. At several points, the fantasy and the reality appear to merge; for example, in one scene, a prisoner puts on his jacket; he is next seen wearing the jacket in the sentimental woods fantasy. The portrayals of sexual perversion occupy in excess of half of the footage of the film.

It should be readily apparent from the preceding description that the film goes far beyond customary limits of candor in offensively depicting certain unorthodox sexual practices and relationships. Thus, the instant film is clearly distinguishable from *Manual Enterprises* v. *Day*, 370 U.S. 478 [8 L.Ed.2d 639, 82 S.Ct. 1432],[4] and similar cases such as *Times Film Corp.* v. *City of Chicago*, 355 U.S. 35 [2 L.Ed.2d 72, 78 S.Ct. 115], and *One, Inc.* v. *Olesen*, 355 U.S. 371 [2 L.Ed.2d 352, 78 S.Ct. 364].[5]

At the outset, we wish to make it patently clear that our conclusion is not based on the particular relationships depicted in "Un Chant d'Amour." ▮ We recognize that the constitutional guarantee is not confined to the expression of ideas that are conventional or shared by a majority (*Kingsley Intl. Pictures Corp.* v. *Regents of University of New York State*, 360 U.S. 684 at pp. 689, 705 [3 L.Ed.2d 1512, 79 S.Ct. 1362]). We think there is no question that there could be an effective and dramatic film about homosexuality and sadism in prisons unaccompanied by any obscene matters (*Kingsley Intl. Pictures Corp.* v. *Regents, supra*) or that a film unquestionably obscene under the applicable standard may not be so when limited to an audience of specialists (cf. *United States* v. *31 Photographs* (S.D.N.Y. 1957) 156 F.Supp. 350).

But from the fact that liberty of expression by means of motion pictures is guaranteed by the First and Fourteenth Amendments, "it does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places. . . . Nor does it follow that motion pictures are necessarily subject to the precise rules governing any other particular method of expression. Each

[4]Wherein the court held that offensive material admittedly intended to appeal to homosexuals was not obscene because the representation and descriptions did not go "substantially beyond customary limits of candor" (at p. 486).

[5]Both of these were *per curiam* reversals after *Roth*. The nature of the materials is described by brief quotations from the lower court opinions in *Zeitlin* v. *Arnebergh, supra*, footnote 22, at page 915.

method tends to present its own peculiar problems'' (*Joseph Burstyn, Inc.* v. *Wilson, supra*, at pp. 502-503).

█ Furthermore, we think that the constitutional protection afforded does not mean that the visual impact of a motion picture as distinguished from other media can be disregarded. Films are obviously different from other forms of expression (*Freedman* v. *Maryland,* 380 U.S. 51, at p. 61 [13 L.Ed.2d 649, 85 S.Ct. 734]). The significance of the motion picture medium is due to the technological features of the particular medium. The unique combination of sight and sound that characterizes a motion picture makes the ideas presented by movies comprehensible to a larger audience than is the case in any other medium except television (see materials cited in 60 Yale L.J., 696, fns. 27 and 28, at pp. 707-708, and 42 Cal. L.Rev., 122, fn. 53, at p. 128). Even in the absence of sound, movies assure a high degree of attention and retention. The focusing of an intense light on a screen and the semi-darkness of the room where distracting ideas and suggestions are eliminated contribute to the forcefulness of movies and their unique effect on the audience (60 Yale L.J., *supra*, at p. 708).

Because of the nature of the medium, we think a motion picture of sexual scenes may transcend the bounds of the constitutional guarantee long before a frank description of the same scenes in the written word. We cannot here disregard the potent visual impact of the movie in depicting acts of male masturbation, fellatio, oral copulation, voyeurism, nudity, sadism and sodomy without any clear reference or relation to a dominant theme. We conclude that measured in terms of the sexual interests of *its intended and probable recipient group* (*Mishkin* v. *New York*, 383 U.S. 502, 509-510 [16 L.Ed.2d 56, 86 S.Ct. 958]) or to the average person, applying contemporary standards, the predominant appeal of the film taken as a whole is to the prurient interest.[6]

We turn next, therefore, to the more difficult and delicate question of whether there is present in the film any matter of social importance (including artistic merit) that would, as appellant argues, recover for the film its protection as a constitutionally protected utterance (*Zeitlin* v. *Arnebergh, supra,* at p. 920).

The fact that the writer, director and producer of the film,

---

[6]We note that appellant concedes that the U. S. Court's rejection of an ''average man'' prurient appeal test in *Mishkin* undercuts a substantial portion of his argument.

Jean Genet, is a French writer of renown does not, as appellant argues, settle the crucial question of whether the film contains sufficient artistic merit. Great artists can create the type of "hard-core" pornography proscribed by our statute. Often, as in *Zeitlin* v. *Arnebergh, supra,* the technical excellence and artistic merit redeem the work despite its obscene content. Unfortunately, that is not the case here. Even appellant's own literary witness admitted that the film was made at the beginning of Genet's career as a playwright and is a transitional work in his development from a novelist into a dramatist. The witness also testified that "Un Chant d'Amour" is much less complicated than his later works and is not easily recognizable as a work of Genet. The artistic merit of Genet's other works does not provide a *carte blanche* when he chooses to venture into the fields covered by the film. As we indicated above, the technical aspects of the motion picture medium simply increase the burden on the artist and add a different and far more sensitive dimension.

The fact that there is no text or dialogue accompanying the film contributes to its ambiguity and the absence of a dominant theme. We think it a significant indication of the film's failure that none of the witnesses produced could agree on its dominant theme.[7] We note that in *Jacobellis, supra,* in holding that the film "The Lovers" was not obscene, the court had no problem of ascertaining the theme or plot of the film. The same clear indication of a particular story line along with the artistic necessity of the objectionable scenes was present in the decisions upholding the film "Lady Chatterley's Lover" (*Kingsley Intl. Pictures Corp.* v. *Regents of University of New York State, supra*) and "Anatomy of a Murder" (*Columbia Pictures Corp.* v. *City of Chicago* (N.D. Ill. 1959) 184 F.Supp. 817). A plot and some attempt at character development was apparently also clearly discernible in *Times Film Corp.* v. *City of Chicago, supra,* and *One, Inc.* v. *Olesen, supra).*

Here the erotic scenes recur with increasing intensity and without direction toward any well-defined, wholesome idea, through scene after scene. The various sexual acts are graphically pictured or emphatically suggested with nothing omitted except those sexual consummations which are plainly sug-

---

[7]Some suggested the effect of isolation and imprisonment upon both prisoners and guards; another, an attempt at penal improvement; others, a comment on the isolated human condition and the difficulties of human contact.

gested but meaningfully omitted and thus by the very fact of omission emphasized. If the film was intended as an artistic portrayal, it clearly failed in its endeavor. The fantasy portions of the film portray purely physical acts of increasing intensity without any contribution to character or plot development.[8] Significantly, it was the very absence of such treatment of sex that led our Supreme Court to conclude that "Tropic of Cancer" was not the hard-core pornography proscribed by section 311, subdivision (a), of the Penal Code (*Zeitlin* v. *Arnebergh, supra,* p. 922). In our opinion, the production does nothing more than depict a number of disjointed scenes treating sex in a shocking, morbid and shameful manner and is devoid of artistic merit.

However, as *Kingsley* pointed out, the constitutional guarantee does not extend only to materials artistically expressed. We are left, therefore, with the question of whether the film contains any other concepts of redeeming social importance. As indicated, the fact that the film is silent and there is no text or explanation to accompany it, contributes to its ambiguity. Precisely because of this ambiguity and lack of ascertainable dominant theme, the film is clearly not a documentary of prison life or a scientific study of prison psychology. While some of appellant's witnesses indicated that the film might reflect on the need for prison reform, all agreed that it should not be shown on television or in a commercial motion picture theatre except possibly with other documen-

---

[8]The presentation of most of the erotic material in the fantasy scenes is significant. As one eminent authority, the noted anthropologist, Margaret Mead, stated: "We may define pornography, cross-culturally, as words or acts or representations that are calculated to stimulate sex feelings independent of the presence of another loved and chosen human being. *The character of the daydream as distinct from reality is an essential element in pornography.* True, the adolescent may take a description of a real event and turn it into a daydream, the vendor of pornography may represent a medical book as full of daydream material, but the material of true pornography is compounded of daydreams themselves, composed without regard for any given reader or looker, to stimulate and titillate. It bears the signature of nonparticipation—of the dreaming adolescent, the frightened, the impotent, the bored and sated, the senile, desperately concentrating on unusualness, on drawing that which is not usually drawn, writing words on a plaster wall, shifting scenes and actors about, to feed an impulse that has no object: no object either because the adolescent is not yet old enough to seek sexual partners, or because the recipient of the pornography has lost the precious power of spontaneous sexual feeling." (Mead, *Sex and Censorship in Contemporary Society,* New World Writing, Third Mentor Selection 18 (1953) quoted in Lockhart and McClure, *The Law of Obscenity and the Constitution,* 38 Minn. L. Rev. 295, fn. 182 at pp. 321-322; italics supplied.)

taries.[9] Dr. Diamond stated: "Like anything else, if it were handled indiscriminately, carelessly, for commercial purposes, I think it might be very bad. Q. So it would lose its effectiveness in your opinion if it were shown indiscriminately? A. I don't think it would lose its effectiveness for certain groups of people, but the effect on other groups might outweigh its effectiveness and is not the only device available for prison reform." Dr. Merrifield also agreed that the film could be harmful.

The record indicates that the film, although shown to an audience somewhat more limited than the general motion picture audience, was commercially exploited and appellant earned substantial amounts from its exhibitions in the Bay Area. Applying the criteria recently set forth in *Ginzburg* v. *United States, supra,* we are, therefore, further propelled toward the conclusion that it is utterly without redeeming social importance and that it meets all of the requirements set forth in section 311, subdivision (a), of the Penal Code. As Mr. Justice Stewart noted in *Jacobellis* v. *Ohio, supra,* at page 197, hard-core pornography is hard to define but "I know it when I see it." We think we have seen it in "Un Chant d'Amour." It is nothing more than hard-core pornography and should be banned.

The judgment is affirmed.

Shoemaker, P. J., and Agee, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 21, 1966. Peters, J., Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.

---

[9] As the federal government has occupied the field of radio and television to the exclusion of the states (*Allen B. Dumont Laboratories* v. *Carroll* (3d Cir. 1950) 184 F.2d 153), this testimony is not pertinent except as an indication that the film was suitable only for a limited audience.