GOLDBERG, J.
I dissent.
Justice Friedman recently wrote: “Judicial disagreements in obscenity cases should be characterized by extreme deference, because obscenity law is a constitutional jungle.” Glancy v. County of Sacramento* (Cal. App.) 94 Cal.Rptr. 864, 877. I appreciate his accuracy, admire his attitude, and adopt his statement. My dissent on the merits is, therefore, reluctant.[1]
*Supp. 42 The defendant Adler was convicted of three charges and the defendant Rose of one charge of violating Penal Code section 311.2. The complaints against Rose were filed on October 18, 1967, October 20, 1967, and June 7, 1968, Nos. 263660, 263687 and 3325M, respectively. The one against Rose was filed on June 10, 1968, No. 3372M. The trial began on December 26, 1968, and the verdicts were returned on January 29, 1969. (On another complaint against Adler, No. 3326M, the court directed a verdict of not guilty; and another complaint against Rose, 3373M, was dismissed by the prosecution.)
Two of Adler’s convictions were based on the sale of obscene motion pictures. The third Adler conviction and the Rose conviction were based on the sale of an obscene book, “Love Together.” This book and these films bring to mind Justice Stewart’s reference to “hard-core pornography” in Jacobetlis v. Ohio (1964) 378 U.S. 184, 197 [12 L.Ed.2d 793, 803-804, 84 S.Ct. 1676]: “I shall not . . . attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, . . .”
The materials now before us are “hard-core pornography” if the term has any meaning. But the expression “hard-core pornography” is as elusive as “obscenity.” (Jacobellis v. Ohio, supra, 378 U.S. at p. 201 [12 L.Ed.2d at pp. 805-806], Warren, C. J., dissenting.) For example, the New York Court of Appeals adopted it in People v. Richmond County News, Inc. (1961) 9 N.Y.2d 578 [216 N.Y.S.2d 369, 175 N.E.2d 681, 685], apparently applied it to sustain another conviction, and was reversed in Mishkin v. New York (1966) 383 U.S. 502 [16 L.Ed.2d 56, 86 S.Ct. 958] (Kuh, Foolish Figleaves? (1967) 58, 78.) And in United States v. West Coast News Company (6th Cir. 1966) 357 F.2d 855, 858, the court reviewed a collection of trash similar to that confronting us and upheld the conviction saying: “We know hard-core pornography when we see it.” In one of its three-line per curiam opinions that became commonplace in obscenity cases, the Supreme Court said simply, “reversed. (Redrup v. New York, 386 U.S. 767 (1967),” (1967) 388 U.S. 447 [18 L.Ed.2d 1309, 87 S.Ct. 2095].) It may be that “hard-core pornography” is no *Supp. 43 more than a “personal obscenity divining rod.” (Kuh, supra, at pp. 63-64.) Nevertheless, I assume that the present materials fit the description, because if they do not, nothing does.
The fact that the materials distributed are hard-core pornography is not alone enough to sustain a conviction. As Redrup, supra, has been applied by the Supreme Court, before a conviction may be sustained there must be not only the distribution of obscene material but distribution under circumstances involving either (a) juveniles, or (b) obtrusion on an unwilling audience, or (c) pandering. The first two of these alternatives are not shown by the evidence before us. The last was irrelevant under Penal Code section 311.2 at the time of the offenses involved here. (People v. Noroff (1967) 67 Cal.2d 791, 793 [63 Cal.Rptr. 575, 433 P.2d 479].) Since one of the three alternatives is required and none are available, the convictions must be reversed.
At the risk of being charged with supererogation, I shall try to explain this in a. little detail: In 1967, Penal Code section 311.2 provided: “Every person who knowingly: Sends or causes to be sent, or brings, or causes to be brought, into this state for sale or distribution, or in this state prepares, publishes, prints, exhibits, distributes, or offers to distribute, or has in his possession with intent to distribute or to exhibit or offer to distribute, any obscene matter is guilty of a misdemeanor.”
“Obscene” was then defined by Penal Code section 311 as follows: “(a) ‘Obscene’ means that to the average person, applying contemporary standards, the predominant appeal of the matter, taken as a whole, is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion, which goes substantially beyond customary limits of candor in description or representation of such matters and is matter which is utterly without redeeming social importance.”
In 1967, sections 331 and 311.2 said nothing about the mode of distribution, but in 1969, section 311 was recast and amended to provide in part in new subparagraph (a): “(2) In prosecutions under this chapter, where circumstances of production, presentation, sale, dissemination, distribution, or publicity indicate that matter is being commercially exploited by the defendant for the sake of its prurient appeal, such evidence is probative with respect to the nature of the matter and can justify the conclusion that the matter is utterly without redeeming social importance.”
This amendment is apparently based on Ginzburg v. United States (1966) 383 U.S. 463 [16 L.Ed.2d 31, 86 S.Ct. 942], discussed infra, and seems designed to alter the law as stated in People v. Noroff, supra, particularly footnote 4 at page 793. The sufficiency, of the amendment *Supp. 44 to preserve more recent prosecutions from Redrup reversals is, of course, not involved here, and I neither express nor intimate any opinion on that problem. But accepting the amendment at its face value as a rule of evidence, rather than as an element of the crime, it has no application here, because the trial here was begun and concluded long before the amendment was adopted. At the time of the trial what was important under sections 311 and 311.2 was the fact of distribution; the circumstances of distribution were irrelevant.
Section 311 emanated from Roth v. United States (1957) 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304], which defined obscenity as: “[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest[,]” id. at page 489 [1 L.Ed.2d at page 1509], and said: “[b]ut implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance^” id. at pages 484-485 [1 L.Ed.2d at page 1507]. Section 311 also anticipated the similar language in Memoirs v. Massachusetts (1966) 383 U.S. 413, 418 [16 L.Ed.2d 1, 5-6, 86 S.Ct. 975]. In re Giannini (1968) 69 Cal.2d 563, 573 [72 Cal.Rptr. 655, 446 P.2d 535].
Ginzburg v. United States (1966) 383 U.S. 463 [16 L.Ed.2d 31, 86 S.Ct. 942], decided the same day as Memoirs, affirmed a federal conviction for mailing obscene material. The court assumed, but did not hold, that the materials could not themselves be adjudged obscene in the abstract. (Id. at p. 474 [16 L.Ed.2d at p. 40].) Instead it looked to the defendants’ conduct in disseminating the materials; e.g., efforts to mail them from, the hamlets of Intercourse and Blue Ball, Pennsylvania, and finally mailing them from Middlesex, New Jersey, id. at pages 467-468 [16 L.Ed.2d at pages 36-37]; the. “leer of the sensualist” permeating the advertising, id. at page 468 [16 L.Ed.2d at page 37]; and the purveyors’ sole emphasis on the sexually provocative aspects of the publications, which “fact may be decisive in the determination of obscenity.” (Id. at p. 470 [16 L.Ed. 2d at p. 38].) In a nutshell Ginzburg held that in determining obscenity one need not look only at the materials but may also look to “the setting in which the publications were presented as an aid . . . .” (Id. at p; 465 [16 L.Ed.2d at p. 35].) It did not hold that one was obliged to look to that setting, although it does say: “It is important to- stress that this analysis simply elaborates the test by which the obscenity vel non of the material must be judged.” (Id. at p. 475 [16 L.Ed.2d at p. 41].)
Discussions since Ginzburg frequently refer to “pandering” because of the reference in the opinion to “the sordid business of pandering—‘the business of purveying textual or graphic matter openly advertised to appeal *Supp. 45 to the erotic interest of . . . customers.’ ” (Id. at p. 467 [16 L.Ed.2d at p. 36].) Since, and perhaps because of, Stanley v. Georgia (1969) 394 U.S. 557, 564, 567 [22 L.Ed.2d 542, 549, 550-551, 89 S.Ct. 1243], the more recent cases refer to “commercial distribution" or “public distribution.” But the citation of Redrup, in Stanley, id. at page 567 [22 L.Ed.2d at pages 550-551], shows that “pandering” is still with us. Further, in the present context “pandering” and “commercial distribution” seem to be synonymous.
Redrup v. New York (1967) 386 U.S. 767 [18 L.Ed.2d 515, 87 S.Ct. 1414], a per curiam opinion, reversed three state obscenity convictions, because “Whichever of these constitutional views [of the members of the Supreme Court] is brought to bear upon the cases before us, it is clear that the judgments cannot stand.” (Id. at p. 771 [18 L.Ed.2d at p. 518].) The materials were not described, but the court pointedly noted that the cases did not involve the states’ concern for juveniles, or prevention of obtrusive assaults on individuals unwilling to be exposed to dubious materials, and that “in none was there evidence of the sort of ‘pandering’ which the court found significant in Ginzburg v. United States, . . .” (Id. at p. 769 [18 L.Ed.2d at p. 517].)
Redrup is so cryptic that in itself it defies analysis and but for its frequent iteration by the court would be useless as a precedent. The penetrating and comprehensive text published shortly after its announcement gives it but passing mention. (Kuh, Foolish Figleaves? (1967) 52, fn. 2, 121, fn. 6, 230, fn. 23.) It has been virtually ignored in the learned periodicals. But the one article on the case says: “Redrup may be the most important obscenity decision since the 1957 landmark of Roth v. United States. ... As of March, 1969, Redrup had been cited as controlling or as a key factor in the reversal of 35 state and federal obscenity convictions.” (Teeter and Pember, The Retreat from Obscenity: Redrup v. New York (1969) 21 Hastings L.J. 175-176. See also State v. Hoyt (1970) 286 Minn. 92 [174 N.W.2d 700, 702, 711] (dissenting opinion); “reversed, Redrup v. New York . . . .” Hoyt v. Minnesota (1970) 399 U.S. 524 [26 L.Ed.2d 782, 90 S.Ct. 2241].)
“By their fruits ye shall know them,” is an admonition that is particularly applicable to Redrup in its California context. Schackman v. Arnebergh (C.D.Cal. 1966) 258 F.Supp. 983, appeal dismissed for lack of jurisdiction (1967) 387 U.S. 427 [18 L.Ed.2d 865, 87 S.Ct. 1622], rehearing denied (1967) 389 U.S. 893 [19 L.Ed.2d 204, 88 S.Ct. 16], was an unsuccessful effort to enjoin a pending prosecution under Penal Code section 311.2. The district court reviewed the evidence, motion pictures of naked women masturbating, in all its sordid details. One of these films, *Supp. 46 D-15, was displayed to this court as an exemplar in Vengetechalliam v. Municipal Court,* No. 194889, and it was, assuming the term has some meaning, “hard-core pornography.” Nevertheless, when the conviction was finally reviewed by the Supreme Court on the merits, it was “reversed. Redrup v. New York, . . Schackman v. California (1967) 388 U.S. 454 [18 L.Ed.2d 1316, 87 S.Ct. 2107]. (On the connection between the two Schackman cases see Hermann v. United States (D.C.App. 1969) 259 A.2d347, 348.)
On the same day that Schackman was reversed, the court affirmed Landau v. Fording (1966) 245 Cal.App.2d 820 [54 Cal.Rptr. 177]. (388 U.S. at p. 456 [18 L.Ed.2d 1317, 87 S.Ct. 2109.) Landau involved a motion picture of men masturbating. Of course, it is inconceivable that the cases turned on some sort of • distinction between auto eroticism in men and women. The difference between Schackman and Landau is that in Schackman pandering was not discussed although the films were shown in a peep-hole machine in an arcade; but in Landau the court found not only that the film was commercially exploited but also that the case met “the criteria recently set forth in Ginzburg v. United States, . . .” (245 Cal.App.2d at p. 830.) In Schackman only three justices would have affirmed on the basis of Ginzburg.
What has apparently happened, therefore, is that what was permitted in Ginzburg has become a requirement under Redrup. If we assume that to sustain an obscenity conviction not only must the material meet the tests of content laid down in Roth and Memoirs, but also that the conduct of the disseminator must show one of the three elements of distribution stated in Redrup, then the different results in Schackman and Landau become comprehensible. Justice Otis dissenting in State v. Hoyt, supra, 174 N.W.2d at page 711, took this position, and he seems to have been correct. The injection of these elements reflects the application of the concept that has been called “variable obscenity,” under which the same given materials may under some circumstances be made the basis of a prosecution and under other circumstances may not. This concept originated in Ginzburg (Kuh, Foolish Figleaves? (1967) at p. 76) and has since been expressly adopted (Ginsburg v. New York (1968) 390 U.S. 629, 635-636 and id. fn. 4 [20 L.Ed.2d 195, 201-202, 88 S.Ct. 1274]).
The above analysis conforms to the results in United States v. Reidel (1971) 402 U.S. 351 [28 L.Ed.2d 813, 91 S.Ct. 1410] and United States v. Thirty-Seven Photographs (1971) 402 U.S. 363 [28 L.Ed.2d 822, 91 *Supp. 47 S.Ct. 1400], decided on the third of May and involving materials intended for commercial distribution. Mere private possession of obscene materials has not been made a crime under the California statutes (In re Klor (1966) 64 Cal.2d 816 [51 Cal.Rptr. 903, 415 P.2d 791]), nor could it be (Stanley v. Georgia (1969) 394 U.S. 557 [22 L.Ed.2d 542, 89 S.Ct 1243]). .But it does not follow that there is “a constitutional right in people like Reidel to distribute or sell obscene material.” (United States v. Reidel, supra, 402 U.S. at p. 356 [28 L.Ed.2d at p. 817].)
Reidel was charged with violating the same statute as Ginzburg, i.e., using the mails for the delivery of obscene matter. Compare 383 U.S. at page 464, footnote 2 [16 L.Ed.2d at pages 34-35] and 402 U.S. at page 352 [28 L.Ed.2d at page 815, footnote 1], He procured the dismissal of the indictment on the basis of Stanley, and the Supreme Court reversed. The court assumed the materials were obscene. (402 U.S. at p. 353 [28 L.Ed.2d at p. 816].) The circumstances of the distribution were, of course, not developed at this stage of the proceedings, but there is enough to suggest, at least, that what Landau v. Fording calls the Ginzburg criteria would be met. (Id. at p. 353, fn. 3 [28 L.Ed.2d at p, 816].) The viability of those criteria is illustrated in the separate concurrence of Justice Marshall: “such mail order distribution poses the danger that obscenity will be sent to children.” (Id. at p. 361 [28 L.Ed.2d at p. 821].) Reidel is essentially similar to People v. Luros (1971) 4 Cal.3d 84 [92 Cal.Rptr. 833, 480 P.2d 633] (proof of probable cause sufficient to indict).
United States v. Thirty-Seven Photographs apparently involves the same alleged pornographer involved in People v. Luros, supra. Luros sought to import the photographs. He stipulated that some or all of them “were intended to be incorporated in a hard cover edition of The Kama Sutra of Vatsyayana, a widely distributed book candidly describing a large number of sexual positions.” (402 U.S. at p. 366 [28 L.Ed.2d at p. 828].) The court held, on the basis of Reidel, that they might be subject to forfeiture under the customs laws. Since the attack was solely on the constitutionality of the statute, it was not necessary to decide, nor did the court decide, that the photographs were obscene.
The court agreed on a judgment, but only four members concurred in Justice White’s opinion that importation of obscenity intended solely for the private use of the importer might be forbidden. Justices Black and Douglas again dissented on the grounds that “the First Amendment denies Congress the power to act as censor . . . .” (402 U.S. at p. 379 [28 L.Ed.2d at p. 836].) Justice Stewart dissented on the basis of Stanley v. Georgia. (Id. at p. 379 [28 L.Ed.2d. at p. 835].) Justice Marshall dissented on the ground that the proceeding was premature: “[T]he Government has ample opportunity to *Supp. 48 protect its valid interests if and when commercial distribution should take place.” (Id. at p. 361 [28 L.Ed.2d at p. 820].) And Justice Harlan concurred in the judgment because Luros had “stipulated that the materials were imported for commercial purposes,” and, therefore, had no standing to raise the overbreadth of the statute as applied to materials for private use. (Id. at pp. 377-378 [28 L.Ed.2d at p. 835].)
Thus, as in the progeny of Redrup v. New York, Reidel and Thirty-Seven Photographs appear to depend not merely on the obscenity of the materials but on the element of commercial distribution or, in Ginzburg terms, pandering. It should be noted that in both of his cases Luros apparently sought to minimize the pandering element by relying on arguments mentioning only the elements of distribution to minors or intrusion on the sensibilities of unwilling adults. (Cf. 4 Cal.3d at p. 90 and 402 U.S. at p. 375 [28 L.Ed.2d at p. 833]. But cf. Stanley v. Georgia (1969) 394 U.S. 557, 567 [22 L.Ed.2d 542, 550-551, 89 S.Ct. 1243].)
There is ample evidence of pandering in the instant case, e.g., the “adult” bookstore and the advertising blurbs on the covers of “Love Together”: “Not one word cut from this fiery tale of sexual excess in which perversion was the order of the day and normal sexuality something weird, square and almost unknown!” “Artists and models writhe together in frantic abandon in a world where anything goes.” (Kuh, supra, at pp. 76, 78.)
But the evidence of pandering cannot be used to sustain the convictions here, because of People v. Noroff (1967) 67 Cal.2d 791 [63 Cal.Rptr. 575, 433 P.2d 479], decided a few months after Landau was affirmed. There it was held that evidence of pandering did not sustain a prosecution under section 311.2. The section did not refer to pandering. “Insofar as dictum in Landau v. Fording . . . suggests a contrary reading of the California statutes, it is hereby disapproved.” (Id. at p. 793.) “Nothing in Klor [In re Klor (1966) 64 Cal.2d 816 (51 Cal.Rptr. 903, 415 P.2d 791)], of course, suggested the adoption of a ‘pandering’ concept similar to that elaborated in Ginzburg in the context of the federal obscenity statute.” (Id. fn. 4.) Since the California Supreme Court declined to include in the version of section 311.2 that is before us an alternative element that the United States Supreme Court indicates must be present if the other alternatives are not present, and they are not present, the convictions must be reversed.
Under Noroff former section 311.2 is overbroad, because it applies to any distribution and is not limited to pandering or commercial distribu *Supp. 49 tion, or, in the language of Dombrowski v. Pfister (1965) 380 U.S. 47,9, 491, 492, 502 [14 L.Ed.2d 22, 31-32, 37, 85 S.Ct. 1116], “hard-core conduct.” This court cannot, because of Noroff, salvage the statute by giving it an acceptable narrowing construction limiting it to “the sort of ‘hard-core’ conduct that would obviously be prohibited under any construction.” (Dombrowski v. Pfister, supra.) The interpretative technique suggested in Dombrowski was employed in In re Cox (1970) 3 Cal.3d 205, 223, 224 [90 Cal.Rptr. 24, 474 P.2d 992], and in United States v. Thirty-Seven Photographs, supra, 402 U.S. at page 375 [28 L.Ed.2d at page 833, footnote 3]. But Noroff makes it unavailable to- us here.
The reason the problem posed by Noroff has not been highlighted before this may be that since Redrup there has, apparently, been no reported decision sustaining a conviction under former Penal Code section 311.2 other than People v. Pinkus (1967) 256 Cal.App.2d Supp. 941 [63 Cal.Rptr. 680]. Pinkus was overruled sub silentio by In re Giannini (1968) 69 Cal.2d 563 [72 Cal.Rptr. 655, 446 P.2d 535]. Monica Theater v. Municipal Court (1970) 9 Cal.App.3d 1, 21 [88 Cal.Rptr. 71] (dissenting opinion). Recently, however, a minority of the Advisory Board to the Joint Legislative Committee for Revision of the Penal Code have questioned the validity of a proposed statute which would make “trafficking in obscenity” a crime. This minority includes the District Attorney of Sacramento County. They said: “The language of the [proposed] section is not limited to commercial transactions or exhibitions and one might be guilty of such a crime if he shows such obscene material to a friend or friends within,the confines of his own home. This comes very close to the mere possession situation discussed in Stanley v. Georgia.” Joint Legislative Committee for Revision of the Penal Code, The Criminal Code (1971) Penal Code Revision Project Staff Draft, page 212. And the problems posed by limited circulation are discussed in The Supreme Court, 1970 Term (1971) 85 Harvard Law Review 3, 229, 235-237.
Another reason that the convictions should be reversed is that the jury was instructed: “for the purposes of determining the obscenity of the matter here in question, the relevant community is the entire State of California.” This instruction was obviously derived from In re Giannini (1968) 69 Cal.2d 563 [72 Cal.Rptr. 655, 446 P.2d 535], Although there is no reference to any community in section 311, Giannini held that “the words ‘customary limits of candor,’ as used in section 311 of the Penal Code . . . require a showing that the material so exceeds customary limits of candor as to affront contemporary community standards of decency.” (Id. at p. 574.) It then held that the contemporary community standards must be established by evidence, and that “For the purposes of *Supp. 50 determining the obscenity of the performed dance here in question, the relevant ‘community’ is the entire State of California.” (Id. at p. 577.)
Giannini was a prosecution for “topless dancing,” i.e., indecent exposure and: lewd conduct in public. Penal Code sections 314, subd. 2 and 647, subdivision (a). It was not a prosecution under section 311.2. Section 311, defining obscenity, was relevant only as an analogy for determining the meaning of the terms “lewd” and “dissolute” in sections 314 and 647, subdivision (a). (Id. at p. 567.) The court carefully pointed out that “the decision to stage a ‘topless dance’ rests solely on local considerations . . .,” but that when dealing with books and films, as in the instant case, different considerations are present. “Evaluation of ‘speech’ that is designed for nationwide dissemination, such as books or films, according to a non-national community standard might well unduly deter expression in the first instance and thus run afoul of First Amendment guarantees. But we need not, in the instant case, reconcile this contention with the practical problems of producing evidence of national standards.” (Id. at p. 579.)
In the case at hand we must make the reconciliation, because here we are involved with books and films. The reasoning of Justices Brennan and Goldberg in Jacobellis v. Ohio (1964) 378 U.S. 184 [12 L.Ed.2d 793, 84 S.Ct. 1676] is compelling: “We do not see how any ‘local’ definitions of the ‘community’ could properly be employed in delineating the area of expression that is protected by the Federal Constitution. . . . [A] standard based on a particular local community would have ‘the intolerable consequence of denying some sections of the country access to material, there deemed acceptable, which in others might be considered offensive to prevailing community standards of decency.’ ” (Id. at p. 193 [12 L.Ed.2d at p. 801].)
This view should prevail as long as the Supreme Court adheres to the opinion that “The freedoms protected against federal encroachment by the First Amendment are entitled under the Fourteenth Amendment to the same protection from infringement by the States.” (United Mine Workers v. Illinois (1967) 389 U.S. 217, 221, fn. 4 [19 L.Ed.2d 426, 430, 88 S.Ct. 353].) Justice Harlan’s opinion that there is a difference between the powers of the states and the United States, and that the Fourteenth Amendment confines the states “only insofar as such power is inconsistent with our concepts of ‘ordered liberty’ ” Roth v. United States (1957) 354 U.S. 476, 501 [1 L.Ed.2d 1498, 1516, 77 S.Ct. 1304], has not prevailed. It has won some adherents, but not enough. (Hoyt v. Minnesota (1970) 399 U.S. 524 [26 L.Ed.2d 782, 90 S.Ct. 2241] (dissenting opinion).)
*Supp. 51 Although there is fear that it may be impossible to prove a national standard (Jacobellis v. Ohio, supra, 378 U.S. at p. 200 [12 L.Ed.2d at p. 805] (Warren, C. J. and Clark, J. dissenting), In re Giannini, supra, 69 Cal.2d at p. 578), some jurisdictions seem able to find the evidence. To the names of such jurisdictions given in Giannini, id. at page 578, should be added that of the District of Columbia. Hermann v. United States (D.C.App. 1969) 259 A.2d 347, 348.
I would reverse the judgments with directions to dismiss.

A hearing was granted by the Supreme Court on August 13, 1971.

This case was not certified for publication.